LANGBEN v. CRESPI & CO. (No. 7742.)

(Court of Civil Appeals of Texas. Galveston. Dec. 20, 1919. Rehearing Denied Jan. 8, 1920.)

1. BROKERS ⊜⟿38(3)—CONTENTION AS TO SHIPPING AGENT'S BREACH OF CONTRACT NOT SUSTAINED BY PLEADING.

In action against shipping agent for delay in furnishing ship, petition pleading duty to furnish ship by last of February, and claiming damages for delay from March 1, *held* not to sustain claim that shipping agent breached contract in January.

2. BROKERS ⊜⟿38(4)—EVIDENCE INSUFFICIENT TO SHOW BREACH OF CONTRACT TO FURNISH SHIP BY REFUSAL TO LOAD ALL FREIGHT ON FIRST STEAMER CHARTERED.

In action against shipping agent for delay in furnishing of ship for shipping of cotton, contention that shipping agent breached contract by refusal to load all cotton on first

---

steamer chartered after the contract had been entered into upon plaintiff's request therefor *held* not sustained by the evidence, where there was evidence that agent at time of such request had engaged other cotton to fill in the vessel, but that he had not done so until after plaintiff had requested him to agree to a postponement of the delivery of plaintiff's cotton.

3. CONTRACTS ⊂⟂346(11)—BREACH OF CONTRACT TO BE PLEADED TO SUPPORT JUDGMENT FOR DAMAGES.

Finding of breach of contract could not sustain a judgment for damages for such breach, where breach was not pleaded.

4. APPEAL AND ERROR ⊂⟂878(6)—PLAINTIFF NOT APPEALING FROM JUDGMENT CANNOT COMPLAIN, ON DEFENDANT'S APPEAL OF LOWER COURT'S FAILURE TO INCLUDE INTEREST IN JUDGMENT.

On defendant's appeal from judgment, where plaintiff did not object in lower court to failure of court to include interest on the damages sustained until the 1st of January of the following year, and presented no such question to appellate court by the cross-assignment, appellate court cannot consider such question in determining whether' defendant's complaint against judgment should be sustained.

5. APPEAL AND ERROR ⊂⟂1151(2)—JUDGMENT WILL NOT BE REVERSED WHERE IT CAN BE REFORMED.

In action against shipping agent for delay in furnishing ship, the rendition of judgment, awarding plaintiff amount of premiums on insurance from March 1, instead of from April 1, on which date court found default had been made, was not ground for reversal of judgment, since judgment could be reformed and made to conform with such finding.

6. BROKERS ⊂⟂22—SHIPPING AGENT WHO LOADED ON FIRST SHIP TO SAIL NOT IN DEFAULT.

Where shipper and shipping agent knew, at time latter's contract to furnish ship was entered into, that it was difficult to procure ships to Europe because of war conditions, shipping agent, if required to furnish ship within reasonable time after delivery to him of shipper's cotton, was not in default in failing to load cotton until June where ship on which it was then loaded was first ship to sail after delivery of cotton to him.

7. APPEAL AND ERROR ⊂⟂1071(3)—INSUFFICIENCY OF EVIDENCE TO ESTABLISH FINDINGS AS TO RULES ESTABLISHED BY CUSTOM IMMATERIAL, WHERE COURT DID NOT APPLY RULES TO CONTRACT.

Insufficiency of evidence to sustain findings as to certain rules established by the usage and custom of certain port *held* immaterial, where court did not apply the rule in construing the contracts in the case.

8. CONTRACTS ⊂⟂212(1)—REASONABLE TIME FOR PERFORMANCE DEPENDENT UPON CONDITIONS EXISTING AT TIME CONTRACT WAS MADE.

The question of what is reasonable time for the performance of a contract must necessarily depend upon the conditions affecting its performance, existing and in contemplation of the parties at the time the contract is executed.

9. CONTRACTS ⊂⟂153—CONTRACT TO BE SO CONSTRUED AS TO GIVE EFFECT TO THE ENTIRE INSTRUMENT.

Stipulation of contract should not be construed so as to be without any effect, if it is possible to harmonize or give effect to the entire instrument.

10. BROKERS ⊂⟂21—SHIPPING AGENT, WHO WAS UNABLE TO SHIP FROM SPECIFIED PORT, REQUIRED TO SHIP BY OTHER COMMERCIAL ROUTE.

Where shipping agent, who had agreed to furnish ship for loading of plaintiff's cotton at Galveston, was unable to furnish ship because no ships were sailing from Galveston, it was his duty to ship cotton by any commercial route if by proper diligence he could do so.

11. BROKERS ⊂⟂38(7)—SHIPPER'S MEASURE OF DAMAGES FOR SHIPPING AGENT'S DELAY IN FURNISHING SHIP STATED.

Where shipping agent had notice that delay in furnishing ship and issuance of bill of lading would delay collection by shipper of the money for which the cotton to be shipped had been sold, shipper's measure of damages for shipping agent's delay in furnishing of ship was the interest on the money which he could have collected for the period of the delay, and the insurance premiums paid by shipper during such period.

12. BROKERS ⊂⟂72—SHIPPING AGENT NOT ENTITLED TO RECOVER EXCESS FREIGHT PAID BY HIM ON POSTPONEMENT OF SHIPPING TO WHICH HE AGREED.

Where shipping agent agreed to a postponement of the delivery of the cotton, he was not entitled to recover the excess freight paid by him upon loading of cotton on ship sailing subsequent to sailing of ship on which cotton could have been loaded but for such postponement in delivery, under rule of maritime committee, giving him option of canceling engagement on shipper's failure to deliver, or shipping on subsequent sailing ship and recover the difference in the freight.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by Crespi & Co. against J. H. Langben. Judgment for plaintiff and defendant appeals. Reversed and remanded.

Maco & Minor Stewart, Albert J. De Lange, and Jules Damiana, all of Galveston, for appellant.

J. D. Williamson, of Waco, and Williams & Neethe, of Galveston, for appellee.

PLEASANTS, C. J. This suit was brought by appellee, a trading corporation, to recover damages of appellant for his alleged breach of three contracts for the shipment of cotton from Galveston, Tex., to Genoa, Italy. The contracts were executed on December 27 and December 29, 1916, and February 15, 1917, respectively. The first and second of these

contracts were each for the shipment of 2,000 bales of cotton, and the third for the shipment of 50 bales. The first contract, and the rule of the maritime committee therein referred to, are as follows:

"Freight Engagement Note.
"Cotton                                    No. 904.

"Langben Bros., Steamship Agents.
"Galveston, Texas, December 27, 1916.

"Messrs. Crespi & Co., Waco, Texas. We beg to confirm your engagement of room for two thousand (2,000) bales of Webb compressed cotton from Galveston to Genoa at 260 cts. per 100 lbs. basis 100 A1 Tramp—insurance, shipper paying wharfage, per Texas European Line S. S. —— or other 100 A1 steamer; to be shipped from interior on or before ——; to be delivered alongside vessel or at her loading berth on or before January 31, 1917. Freight to destination to be prepaid at Galveston. Agents are endeavoring to secure a January steamer but in view of unsettled conditions do not guarantee loading date. Each bale guaranteed to have a minimum density of 34 lbs. per cubic foot.

"Steamer has option of calling at other port or ports in any order to load and/or discharge coals and/or other cargo and/or passengers. It is understood and agreed that this contract is made subject to the rules of the maritime committee of the Galveston Cotton Exchange and Board of Trade, extracts from which are printed on the back, and all of which are made a part hereof, and on the express understanding that it is subject to all clauses and conditions contained in the ocean bill of lading used by the vessel, copies of which will be furnished on application, and said bill of lading is made a part of this contract. Prepaid freight will be considered earned, ship or goods lost or not lost.

"This contract shall not be relet or transferred without consent of the steamship agent.

"Signed in duplicate. Langben Bros., Ship Agents. ——, Broker.

"Approved and accepted: Crespi & Co., by G. T. Taylor, Shippers."

Extract from the Rule of the Maritime Committee of the Galveston Cotton Exchange and Board of Trade:

Rule 3.—Delivery of Goods.

"If the goods are not shipped or delivered in accordance with the contract, the ship agent, at his option, may cancel same, or carry forward to a latter position or steamer, or re-engage at best rate obtainable, the shipper paying any freight difference and demurrage incurred. If no other cargo of such nature as the ship can carry can be secured, in a similar position, the shipper shall be responsible for dead freight. Shipper to have option of canceling engagement, providing the ship agent does not furnish tonnage within a period of ten (10) days after the date of the steamer as specified in freight contract. In the event that shipper has not negotiated custody ocean bills of lading, the ship agent upon cancellation by the shipper of contract as above, and surrender of custody bill of lading, to transfer the shipment to any steamer on which the freight room be provided by the shipper, that will insure

earlier movement of the goods; cost of transfer to be borne by the shipper.

"Notice of arrival of cotton on through or local bills of lading or the surrender of local bills of lading or delivery of goods to the ship agent shall not release the shipper from responsibility as to the correct time of shipment or delivery of the goods."

Appellant conducts his business under the name and style of Langben Bros.

The second and third contracts were in all respects the same as the first, except that neither contained the clause, "Agents are endeavoring to secure a January steamer, but on account of unsettled conditions do not guarantee loading date," and no date for delivery of the 50 bales at Galveston is specified in the third contract, the cotton being en route to Galveston at the time the contract was made.

Plaintiff alleged that the defendant by the first two contracts agreed to furnish a boat in the month of January, 1917, for the shipment of 4,000 bales of cotton from Galveston to Genoa, at the rate of $2.60 per hundred pounds; and that as to the third contract the agreement of the defendant was to furnish a ship in the month of March, 1917.

Plaintiff further alleged that it delivered the cotton in accordance with the contracts or extensions granted by the defendant, and that the defendant failed to provide a boat or boats for shipment in January, February, or March, and refused to issue either port or custody bills of lading for 2,100 bales of such cotton until the months of June, July, and August, 1917, whereby plaintiff was deprived of the use of money invested by it therein which it would, in the ordinary course of business, had defendant complied with his contracts, have recouped itself for by discounting at the banks its drafts with bills of lading attached, and that by reason of the defendant's failure to fulfill his obligation in said contracts and the great delay incurred thereby plaintiff was unable to obtain bills of lading against which to draw their drafts until on or about June 24, 1917, thereafter, to their damage in interest and insurance premiums paid during such delay as follows: Interest upon $63,307.40 at 7 per cent, from March 1, 1917, to June 24, 1917, which is 3 months and 23 days, and the amount of interest is $1,390.77 with 6 per cent. interest on said sum from June 24th; insurance of $770 upon that particular lot of cotton, which was the insurance from March 1, to June 24, 1917, with interest on said sum at 6 per cent. per annum from that date; interest upon $158,306.44 at 7 per cent. from March 1, 1917, to July 12, 1917, which is 4 months and 11 days and which aggregates the sum of $3,816.92 with 6 per cent. interest on said sum from July 12, 1917; and the further sum of $2,787.40 insurance paid from March 1, to July 12, with 6 per cent. interest on said sum, from July 12, 1917; and the interest

upon the sum of $17,654.03 at the rate of 7 per cent. from March 1, 1917, to August 13, 1917, which is 5 months and 12 days, and aggregates the sum of $556.06; also the sum of $409.64, together with interest upon said sum at 6 per cent. per annum from August 13, 1917, which was the insurance upon that lot of cotton from March 1 to August 13, 1917.

Besides the general denial, the defendant's answer avers that all three of these contracts were in truth but one contract, and that the proviso in the first, "Agents are endeavoring to secure January steamer, but on account of unsettled conditions do not guarantee loading date," was intended to be in all three, and was omitted from the last two contracts by a mutual mistake of the parties. That the defendant, Langben, was bound only to use reasonable diligence to secure a steamer for the transportation of cotton from the port of Galveston to Genoa, and that he did use such diligence.

Defendant further pleads that the decree of the Italian government, prohibiting the importation by an Italian citizen of an excess of 1,000 tons of goods by any one party without obtaining authorization to do so, relieved Langben from the necessity of transporting such cotton until such authority had been obtained by Crespi & Co.; also that by reason of the failure of Crespi & Co. to deliver the respective lots of cotton on or before January 31, Langben could not possibly have issued bills of lading for either January or February shipment, and that proper bills of lading were thereafter duly issued and accepted by plaintiffs as in full compliance with all the obligations assumed by defendant, Langben; that at the time of entering into said contract for the transportation of said cotton it was well known to and understood by the parties thereto, Crespi & Co. and Langben, that a state of war existed generally throughout all that portion of the world doing business on the Atlantic Ocean, and that the transportation of such cotton was dependent wholly upon the obtaining by Langben of steamers to carry and transport said cotton to Genoa; that the state of war continued from the time of entering into such contracts until the cotton was ultimately transported; and that it was impossible and impracticable, by reason of the war prevailing, to have transported the cotton at an earlier date.

By plea of reconvention, defendant averred that plaintiff had failed to deliver the cotton covered by the last two contracts on or before January 31, 1917, alongside the vessel at her loading berth, in accordance with the provisions of said contracts, and that defendant under rule 3 of the maritime committee, before set out, had carried the shipment forward to the next available steamer, and that plaintiff under said rule was liable for the difference in the freight rate named in the contract and the rate defendant was compelled to pay for the trans-

portation of the cotton from Galveston to Genoa. This difference it was averred was $60,868.41, and for this amount defendant prayed judgment against the plaintiff.

The cause was tried in the court below without a jury, and judgment was rendered in favor of plaintiff for the sum of $8,521.13 interest and insurance premiums claimed in the petition. Judgment was rendered against defendant on his plea in reconvention.

The evidence shows that at the time the first and second contracts were made appellant had not chartered any steamer, and had no contract with any vessel to carry cotton or freight of any kind from Galveston to Genoa, or any European port.

Because of the difficulty and uncertainty of obtaining a steamer under the then prevailing war conditions, which was known to both parties, the first contract expressly provided that the date of loading was not guaranteed. As found by the trial court:

"The three contracts were several and distinct, but it was well understood between the parties, the same conditions being known by both parties to exist when they made the second and third contracts as existed when the first contract was made, that the clause, 'Agents are endeavoring to secure a January steamer but in view of unsettled conditions do not guarantee loading date,' applied to and was considered to be incorporated in the last two contracts. Its omission was due to inadvertence upon the part of the defendant, who drew up all of the contracts, and it was understood by Crespi & Co. to apply to the second and third contracts the same as though it had been incorporated therein."

On January 5, appellant engaged or chartered the steamer Helge. This steamer arrived in Galveston on January 31, completed loading its cargo and sailed on February 5th, and 1,950 bales of appellee's cotton, which had been delivered to appellant, was shipped on this steamer.

On January 13, before the arrival of the Helge, appellee had requested appellant to agree to postpone the delivery of 1,550 bales of the cotton covered by the first two contracts. There was ample room on the Helge to carry all of appellee's cotton, but after the request for delay of delivery appellant engaged other cotton to fill in the vessel, and there was no room for more than the 1,950 bales of appellee's cotton.

The date of delivery of all of the cotton to appellant is not shown, but the record does show that 1,600 bales were not delivered until after the Helge had sailed, as shown by the following statement of deliveries:

"February  7, 534 bales.
"February  9, 448 bales.
"February  9, 400 bales.
"February 12, 400 bales.
"February 19, 102 bales.
"February 24,  50 bales.

"Total     1,600 bales.

On January 24 appellant, in reply to a request of appellee through its agent at Galveston to ship 900 bales on the Helge in addition to the 1,950 bales, informed the agent that it was impossible for him to do so. It is not shown when this 900 bales were delivered to appellant or reached Galveston, but from the statement of deliveries of the 1,600 bales above set out it is evident that at least 500 bales of the 900 bales were not delivered until after the Helge sailed, and it is further shown by the correspondence between the parties that 400 of these 900 bales were not started from the interior of the state until January 23.

In regard to the shipment of the 1,950 bales on the Helge and his failure to ship the 900 bales as requested by appellee, appellant testified:

"We had the Helge of capacity sufficient to carry 4,000 bales, but about the middle of January, Crespi, through Ziegler, was requesting us to postpone and defer shipment of 1,550 bales, and we made our arrangements accordingly subsequent thereto, and took other cotton to fill the Helge; the Helge carrying much more than that. The Helge arrived in Galveston January 31. * * * It would have been foolish to advise Crespi before the Helge sailed that I had room for 2,000 bales on the Helge, which sailed on the 5th, as they [Crespi] had repeatedly requested, and finally prevailed on us, to defer shipment for them. The first request to defer shipment was made January 13, on Crespi's request by telephone from Bloomfield, Ziegler's clerk. At that time, on January 13, we had a steamer on which we could have shipped the cotton—the Helge. No definite arrangement was made, but they were requesting us to defer the shipment of 1,550 bales. We were negotiating continuously from that time [January 13] until the 7th of February.

"If Bloomfield requested us to add 900 bales to the 1,950 on the Helge, and it was refused, it was done after other arrangements had been made to fill the Helge."

The parties finally agreed on February 2 that the time for delivery by appellee of the then undelivered portion of the cotton should be extended to February 10. The undisputed evidence shows that appellant made continuous and diligent effort to procure a steamer to carry the appellee's cotton, but that, owing to the war, and to an order promulgated by the allied governments of Italy, France, and Great Britain, which forbade the chartering of steamers by individuals for the transportation of cargoes to Italy, it was impossible for him to procure a steamer to transport appellee's cotton from Galveston to Genoa, and he was not able to engage room on any ship for such transportation until the last of May or first of June, when he secured room on the steamer Carl for 1,948 bales. The Carl arrived at Galveston on June 6, and sailed with the cotton on June 24. This was the first shipment from Galveston to Europe after the

sailing of the Helge. The remaining 152 bales of cotton was shipped from Galveston by steamer to New York and there transferred to the steamer Manxman, which carried it to Genoa in August, 1917. The freight paid by appellant for these two shipments was $64,868.41 in excess of the amount he received from appellee under his contract. He did not then claim that appellee was liable to him for this excess and made no such claim prior to the filing of his plea in reconvention in this suit. When each of these shipments was made appellee paid appellant the amount he had contracted to pay for such shipment, and made no claim that appellant was liable for damages for delay in carrying out the contract of affreightment.

There is testimony showing that in May appellant was informed by appellee that room for the transportation of the cotton could be procured on a steamer plying between New York and Genoa, and appellee suggested that he engage room in said steamer and forward the cotton by coastwise steamer from Galveston to New York. Appellant declined to do this, saying that he was negotiating with a steamer from Cuba which he hoped to get to come and transport the cotton.

The trial court finds that:

"In the light of the custom of the port the contracts without the clause, 'Agents are endeavoring to secure a January steamer but in view of unsettled conditions do not guarantee loading date; meant that the cotton covered by the first two contracts was to be shipped the following month in January or port bill of lading given for it in January and actual shipment to be made not later than 21 days thereafter. * * *

"I find as conclusion of fact that there was no guaranty by defendant of sailings, that is, of the specific time when vessels would be ready to receive cargo, but that it was fully understood, and such is the proper construction of the contracts, that the defendant would not merely use his best exertions to obtain ship or freight room as early as practicable, but that he would absolutely furnish ship or freight room for shipments required within a reasonable time, which I find as to contracts Nos. 904 and 910 to be any time prior to April 1, and as to No. 960 any time before May 1, 1917."

His conclusions of the law upon these facts are as follows:

"Under these facts the law is for the plaintiff, and it is entitled to recover from defendant interest on the amount it was to be reimbursed on the 2,100 bales of cotton; as to the 2,050 bales from the 1st of April, 1917, until the several dates when they were able to procure from the defendant bills of lading, at the rate of 7 per cent. per annum, and interest thereon at 6 per cent. per annum from the 1st of January, 1918, on that amount to date of judgment; and in like manner to recover on account of default as to the 50 bales from the 1st of May, 1917; also the insurance premiums paid by it

necessitated by the delay, with interest from the 1st of January, 1918, at the rate of 6 per cent. per annum."

Appellant's first assignment of error complains of the judgment on the ground that it is not supported by the findings of fact, but is contrary thereto. As before shown, the trial court found that appellant made default on April 1 in the shipment of the cotton covered by the first and second contracts, and defaulted in the shipment of the cotton covered by the third contract on May 1. Notwithstanding these findings, judgment was rendered for plaintiff for the amount of premiums on insurance from March 1. This contradiction between the fact findings and the judgment is unquestionably shown by the record. Appellee insists, however, that the error is harmless for two reasons: First, because the contract was breached by appellant on January 24, and appellee under the court's findings was entitled to recover all insurance premiums paid after January 31; and, second, because in any event appellee was entitled to recover interest on the insurance premiums from the date of appellant's default, and as the judgment only allows interest thereon from January 1, 1918, the error is immaterial, and the amount adjudged is less than the aggregate to which appellee was entitled under the court's findings. We think neither of these contentions can be sustained.

There is neither pleading nor evidence to sustain the claim that appellant breached his contract with appellee on January 24.

[1, 2] The petition only alleges a breach of contract by appellant in failing to furnish a ship to carry appellee's cotton in accordance with a general usage and custom governing contracts of affreightment, the custom or rule alleged being:

"That a shipment to be delivered alongside a vessel or at loading berth on or before the first day of any respective month was to be loaded and shipped within said month, and that in event the freight was not delivered within such time, or if an extension be granted within the following month, then such freight need not be shipped and the freight contractor need not ship same until the last day of such succeeding month."

The meaning of this rule is not clear to us, but appellee's petition construes it as requiring appellant, under the facts of this case, to furnish a ship for appellee's cotton by the last of February, and the petition only claims damages for delay from March 1st. There is a finding by the trial court:

"That the defendant was in default for refusal to carry the 900 bales of cotton by the S. S. Helge; and it appears from the evidence that plaintiff's request for extension of delivery had no application to these 900 bales."

[3] This finding, if supported by the evidence, could not, in the absence of pleading by appellee that appellant had breached his contract by refusing to ship the 900 bales on the Helge, sustain a judgment for damages caused by such breach, and the trial court did not base the judgment for damages in favor of appellee on such findings, and it was evidently only considered by the trial judge in determining the question of appellant's right to recover on his plea in reconvention, in which he claimed damages for the alleged failure of appellee to furnish the cotton for shipment on the Helge.

[4] There was no objection in the trial court, and no cross-assignment presented in this court, questioning the ruling of the trial court that appellee was not entitled to interest on the damages it sustained until the 1st day of January succeeding the date such damage was caused, and that question cannot be considered by us in determining whether appellant's complaint against the judgment should be sustained.

[5] The assignment must be sustained, but this holding does not authorize us to reverse the judgment, because there is data in the record from which the judgment can be reformed and made to conform to the facts found by the trial court. Other questions, however, are presented which, in our opinion, require the judgment to be reversed.

[6] We are unable to agree with the learned trial judge in his conclusion that the evidence authorizes the finding that appellant defaulted in his contracts on April 1st and May 1st, respectively. This conclusion of the trial court is assailed by appellant under appropriate assignments of error.

[7, 8] The finding that appellant was in default on April 1 and May 1, respectively, is not based on any usage or custom of the port as to when a ship or room for freight on a ship must be furnished under contracts like those upon which this suit is brought. Appellee alleges in his petition that under the rule established by the usage and custom of the port the ship must be furnished during the month in which the delivery to the ship agent is required by the contract to be made. The trial court finds that without the clause, "Agents are endeavoring to secure a January steamer but in view of unsettled conditions do not guarantee loading date," the contract, in the light of the custom of the port, meant that a bill of lading should be given for the freight during the month of January, and actual shipment should be made not later than 21 days thereafter. We have not found the evidence upon which this statement of the rules is based, but the finding is immaterial, because the court does not apply the rule to the contracts in this case, but holds that appellant was only required under his contracts to furnish the ship to transport the cotton within a reasonable time after its delivery to him, and fixes the dates above specified as the limit of time which in reason he was en-

titled to have to procure the ship or room on a ship for the transportation of the cotton. If the trial court correctly construed the contract as an absolute undertaking on the part of appellant to ship the cotton within a reasonable time, we do not think the evidence sustains the finding that a reasonable time for procuring the ship expired on the dates fixed by the court. The question of what is a reasonable time for the performance of a contract must necessarily depend upon the conditions affecting its performance existing and in contemplation of the parties at the time the contract is executed. The scarcity of ships and the difficulty of procuring them for commercial use, due to the fact that a large portion of the civilized world was then at war, and the probability that these shipping conditions would grow worse, was fully known and contemplated by the parties when the contract was made.

[9] The undisputed evidence shows that under the war conditions existing during the first half of 1917 no ship sailed from Galveston to Europe after the Helge, which sailed on February 5, until the Carl sailed with appellee's cotton the last of June. During all of this time every possible effort was made to obtain ships to carry freight from this port to European ports. The proclamation of the allied governments, prohibiting the private chartering of ships for transporting cargoes to Italy, and the unrestricted submarine warfare carried on by Germany, made it impossible for the appellant to procure a ship to carry plaintiff's cotton from Galveston to Genoa sooner than he did. In these circumstances, how can it be said that he did not perform his contract within a reasonable time? The parties understood and anticipated when the contract was entered into that these very conditions might arise, and the clause stating that appellant did not guarantee the date of loading the cotton on the ship was placed in for the evident purpose of relieving appellant from liability for delay in procuring the ship if such delay was due to war conditions. It could have been inserted for no other purpose, and, if not given that effect, we must conclude that it was not intended to have any effect, and no contract should be so construed if it is possible to harmonize and give effect to the entire instrument.

[10] We agree with the trial court that appellant's obligations under the contract were not restricted to procuring a ship to come to Galveston and take the cotton directly to Genoa, and if by proper diligence he could have shipped the cotton by any commercial route it was his duty to have done so. The main purpose of the contract was to have the cotton transported to Genoa as promptly as possible, and the route was immaterial so long as this purpose was accomplished. Both parties so understood and construed the contracts. That appellant so construed them is evidenced by the fact that he did ship a portion of the cotton by steamer to New York, where it was delivered to another steamer which took it to Genoa. As before stated, there is some evidence in the record from which it might be found that the cotton could have been shipped in this way earlier than the time it was shipped by appellant, but this evidence is not sufficient to sustain the finding that it could have been shipped on the dates found by the trial court, nor is it sufficiently definite for this court to determine when it might have been shipped.

[11] We also agree with the trial court in the holding that appellant had notice of the general method employed by exporters of cotton in obtaining pay for their cotton, and must have known that his delay in obtaining a ship or room on a ship for the transportation of the cotton, and the consequent delay in the issuance of a bill of lading, would delay the collection by appellee of the money for which the cotton had been sold, and appellee would thereby suffer the damages claimed. We think the interest on the money and the insurance premiums paid by appellee was the correct measure of its damage.

The loss of the use of the money appellee had invested in the cotton caused by the delay in its shipment was the very kind of damage that appellant might reasonably have expected to result from his failure to ship the cotton, and interest on money withheld from one entitled to receive it is the general measure of the damage to the injured party. Railway Co. v. Jackson, 62 Tex. 214; Railway Co. v. Greathouse, 82 Tex. 104, 17 S. W. 834.

[12] We also think the trial court correctly held against appellant on his plea in reconvention. Rule No. 3 of the maritime committee, under which appellant claims the right to recover the excess freight paid by him, has no application to facts of this case. Appellant agreed to a postponement of the delivery of the cotton, engaged other freight for the Helge, and accepted the cotton for subsequent shipment. Such being the facts, he cannot claim damages for the failure of appellee to deliver the 4,000 bales of cotton for transportation by the Helge.

We think the undisputed evidence shows that appellant did not breach his contract by refusing to ship 900 bales of appellee's cotton on the Helge, but if such breach had been shown by the evidence it could not avail appellee, because it was not pleaded.

For the reasons indicated the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.